# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>        -v-<br><br>ANY AND ALL OWNERSHIP INTEREST HELD IN THE NAME, ON BEHALF OR FOR THE BENEFIT OF JOSEPH TAUB AND/OR JT CAPITAL LLC, *et al.*,<br><br>          Defendants. | Civil Action No. 16-9158<br><br>Misc. No. 16-304<br><br>Hon. John Michael Vazquez, U.S.D.J. |

---

## REPLY BRIEF OF CLAIMANT JOSEPH TAUB IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED FORFEITURE COMPLAINT AND TO VACATE THE DECEMBER 9, 2016 RESTRAINING ORDER

---

Lawrence S. Lustberg, Esq.
Jason R. Halpin, Esq.

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Phone: (973) 596-4500
Fax: (973) 596-6328

Jonathan R. Streeter, Esq.
Roger A. Burlingame, Esq.
Theodore E. Yale, Esq.

**DECHERT LLP**
1095 Avenue of the Americas
New York, New York 10025
Phone: (212) 698-3500
Fax: (212) 698-3599

*Attorneys for Claimant Joseph Taub*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

I.    THE GOVERNMENT'S NEW THEORY OF COORDINATED
      TRADING DOES NOT ALLEGE A CRIME. ................................................3

II.   AS THE COURT HELD, THE GOVERNMENT MUST SHOW
      THAT IT CAN TRACE THE ASSETS IT HAS SEIZED TO
      MANIPULATIVE TRADING. .....................................................................14

III.  EVEN IF THE GOVERNMENT COULD ALLEGE THAT THE
      TRADES WERE MANIPULATIVE, IT DOES NOT TRACE THE
      SEIZED FUNDS TO TAUB'S TRADING. .................................................18

IV.   THE GOVERNMENT'S ALLEGATIONS OF MONEY
      LAUNDERING DO NOT SAVE ITS TRACING DEFICIENCIES............21

V.    TAUB HAS SHOWN THAT THE GOVERNMENT HAS SEIZED
      MILLIONS OF DOLLARS IN PROCEEDS THAT FALL OUTSIDE
      EVEN THE INITIAL PATTERN ALLEGED. ............................................25

CONCLUSION ....................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................4, 24, 28

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
  480 F.2d 341 (2d Cir. 1973) ..............................................................................5

*CP Stone Fort Holdings, LLC v. Doe* (*CP Stone II*),
  No. 16 C 4991, 2017 WL 1093166 (N.D. Ill. Mar. 22, 2017)............................7

*CP Stone Fort Holdings, LLC v. Doe*,
  No. 16 C 4991, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016)...................6, 7, 10

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ..............................................................................9

*GFL Advantage Fund Ltd. v. Colkitt*,
  272 F.3d 189 (3d Cir. 2001) .....................................................................*passim*

*Hoagburg v. Harrah's Marina Hotel Casino*,
  585 F. Supp. 1167 (D.N.J. 1984)......................................................................13

*Kaley v. United States*,
  571 U.S. 320 (2014)..........................................................................................18

*S.E.C. v. Coates*,
  No. 94-cv-5361, 1994 WL 455558 (S.D.N.Y. Aug. 23, 1994) .........................18

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977)........................................................................................4, 5

*Schreiber v. Burlington N., Inc.*,
  568 F. Supp. 197 (D. Del. 1983), *aff'd,* 731 F.2d 163 (3d Cir.
  1984), *aff'd,* 472 U.S. 1 (1985)..........................................................................5

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
  119 F. Supp. 3d 1213 (C.D. Cal. 2015) ...........................................................4, 8

*Sullivan & Long, Inc. v. Scattered Corp.*,
   47 F.3d 857 (7th Cir. 1995) ...................................................................5

*Trustcash Holdings, Inc. v. Moss*,
   668 F. Supp. 2d 650 (D.N.J. 2009) .......................................................5

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
   Civ. No. 13-7884, 2018 U.S. ...............................................................12

*United States v. $1,399,313.74 in U.S. Currency*,
   591 F. Supp. 2d 365 (S.D.N.Y. 2008) ...........................................22, 23

*United States v. $2,200,000 in U.S. Currency*,
   No. 12-cv-3501, 2014 WL 1248663 (D. Md. Mar. 26, 2014)............17

*United States v. $448,342.85*,
   969 F.2d 474 (7th Cir. 1992) ........................................................19, 24

*United States v. $506,069.09 Seized From First Merit Bank*,
   664 F. App'x 422 (6th Cir. 2016) .......................................................17

*United States v. $8,221,877.16 in U.S. Currency ($8,221,877.16 I)*,
   330 F.3d 141 (3d Cir. 2003) ................................................15, 21, 24

*United States v. $8,221,877.16 in U.S. Currency ($8,221,877.16 II)*,
   No. 00-cv-2667 (D.N.J. July 7, 2004) .................................................16

*United States v. Any & All Funds on deposit at JPMorgan Chase*, No.
   12-cv-7530, 2013 WL 5511348 (S.D.N.Y. Oct. 2, 2013) ...................17

*United States v. Baker*,
   227 F.3d 955 (7th Cir. 2000) ...............................................................22

*United States v. Bansal*,
   663 F.3d 634 (3d Cir. 2011) ................................................................22

*United States v. Clarkson Auto Elec., Inc.*,
   No. 10-cr-6111, 2012 WL 345911 (W.D.N.Y. Feb. 1, 2012) ............22

*United States v. Coffman*,
   859 F. Supp. 2d 871 (E.D. Ky. 2012) ..................................................22

*United States v. Coscia*,
866 F.3d 782 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 1989 (2018) ..........6, 7, 11

*United States v. Mondragon*,
313 F.3d 862 (4th Cir. 2002) ...................................................................16

*United States v. Monsanto*,
491 U.S. 600 (1989)........................................................................15, 18

*United States v. Mulheren*,
938 F.2d 364 (2d Cir. 1991) ....................................................................6

*United States v. One Gulfstream G-V Jet Aircraft*,
941 F. Supp. 2d 1 (D.D.C. 2013)...........................................................16

*United States v. One Partially Assembled Drag Racer*,
899 F. Supp. 1334 (D.N.J. 1995)...........................................................16

*United States v. Puche*,
350 F.3d 1137 (11th Cir. 2003) .........................................................23, 24

*United States v. Tencer*,
107 F.3d 1120 (5th Cir. 1997) ................................................................24

*United States v. Two Parcels of Real Property*,
92 F.3d 1123 (11th Cir. 1996) ...............................................................17

*United States v. Voigt*,
89 F.3d 1050 (3d Cir. 1996) ..............................................................*passim*

**Statutes**

18 U.S.C. § 981(a) ...............................................................................21

18 U.S.C. § 981(a)(1)(A) .......................................................................15

18 U.S.C. § 983(c)(3)............................................................................23

18 U.S.C. § 984 ..................................................................................15

18 U.S.C. § 1956(a)(1)(A) & (B)..............................................................21

**Other Authorities**

David Goodboy, *5 Market Manipulation Tactics And How To Avoid Them*, Nasdaq (April 11, 2018, 03:30:00 PM), https://www.nasdaq.com/article/5-market-manipulation-tactics-and-how-to-avoid-them-cm946807 .......................................................................6

Mary Schapiro, Chairman, U.S. Sec. & Exchange Comm'n, "Strengthening Our Equity Market Structure" (speech of Sep. 7, 2010), available at https://www.sec.gov/news/speech/2010/spch090710mls.htm ...........................10

**Rules**

Rule G(2)...................................................................................................4, 14, 15, 18

Rule G(2)(f)...........................................................................................................15

The government accuses Joseph Taub of engaging in "Coordinated Trading Events" ("CTEs"), a term it made up for this litigation. In the original Complaint, a "typical" CTE followed a particular pattern involving short selling, [Dkt. 1] ("Compl.") ¶ 20, and in some instances was done via "straw" accounts, Compl. ¶ 17, and in the face of warnings from brokerage firms, Compl. ¶¶ 45-50. But when pushed, the government conceded that less than 30% of Taub's trades fit this pattern. *See* Transcript of May 15, 2018 Hearing ("Hrg. Tr.") at 30:21-24. The remaining more than 70% were supported by conclusory allegations that coordinating trading in two accounts constituted market manipulation.

In dismissing the Complaint, this Court found that the trading at issue "occurred in different manners," and that for CTEs not fitting the pattern above, the government failed to adequately detail how they were manipulative. *See* Hrg. Tr. at 39:8-13. Therefore, in any amended complaint, the Court held the government would need to show two things: "the first step is what's the exact theory of manipulation. If it's a viable theory, then what assets trace back to that manipulation?" *Id.*; *see also id.* at 81:1-7 ("First, pursuant to the supplemental rules, the United States is going to have to set forth sufficient allegations of the alleged criminal activity. Secondly, assuming that the United States is able to do so, they're going to have to trace that criminal activity to the funds that they have seized pursuant to the complaint. And they're going to have to do it precisely.").

These holdings are the law of the case. Yet the government ignores them. Rather than improve its allegations as the Court directed, the government eliminates its detailed description of typical CTEs from the Amended Complaint, substituting in its place a broad definition of the term and five CTE examples without description.

*Compare* Compl. ¶¶ 20, 23-31 *with* [Dkt. 130] ("Am. Compl.") 35-38; *see also* [Dkt. 162-1] ("Taub Mem.") at 8-10, 14-16. The Amended Complaint still describes, at length, Taub's supposed flouting of warning letters, Am. Compl. ¶ 62-67, and harps on his use of "straw" accounts. S*ee id.* ¶¶ 42-61, 165-72, 200-346. Indeed, almost a third of the document is taken up by descriptions of Taub's "straw" account trading and of the profits that he derived from it. *Id.* But in its brief defending the sufficiency of its allegations, the government now expressly disavows the import of the conduct that the Court found could support a plausible theory of manipulation. Instead, without mentioning the Court's order or explaining why it is not applicable, the government argues that the Amended Complaint's broader, more generalized allegations—allegations that provide *less* detail about the trading and do not include the features upon which this Court relied in finding that the government could plausibly make out a crime—pass muster.

The government's rejection of the Court's tracing order is even more explicit. In a footnote on page 49 of its brief—the first and only time the government even acknowledges the Court's prior rulings—the government describes the law of the case as "the court's statement . . . that the complaint must precisely trace tainted funds to specific trades." [Dkt. 175] ("Gov. Mem.") at 49 n.9. Dismissing the Court's "statement" as inconsistent with the government's prior explanation of the law, the government sets forth its own, contrary view: that it "need not trace the defendants in rem to illegal activity." *Id.*

The government's repudiation of the Court's order is extraordinary; but it is also understandable. For the government cannot both follow the Court's ruling and make out a valid complaint. It cannot allege a valid theory of manipulation broad

2

enough to capture all the trading it wants to claim is illegal or the assets it has seized. And it cannot trace the seized property to specific illegal trades. For that reason, and those already set forth the by the Court, the Amended Complaint must be dismissed.

## I.    THE GOVERNMENT'S NEW THEORY OF COORDINATED TRADING DOES NOT ALLEGE A CRIME.

Once Taub filed the instant motion pointing out that he earned millions of dollars from trades that lacked short sales, straw accounts and warning letters, the government disavowed those factors' relevance to its theory of market manipulation. *See,* Gov. Mem. 72-74 ("The government's definition of CTEs does not include receiving warnings from banks. . . . The government has defined CTEs in such a way that trading in a nominee name is not an element either of market manipulation broadly, or part of the government's definition of CTEs. . . . The Amended Complaint's definition of CTEs does not include whether the CTEs were comprised [*sic*] of short or long trades." (emphasis added)). The government now states that there are not, as the Court found, multiple theories of manipulation, but just one: it contends that "all instances where two accounts are trading at the same time in one stock with one account . . . profiting from the movement in the price of the stock caused by the other account" were manipulative. Gov. Mem. at 30-31. In other words, the government argues that the Court's previous reliance on allegations about "straw" accounts, short selling, and ignored warning letters from brokerage firms misconstrued the government's theory, and that instead of alleging multiple patterns of manipulation—only some of which the Court found sufficient to withstand a motion to dismiss—the government is alleging just a single theory that does not require any of this conduct. It is, the government contends, the mere act of coordinated trading—even when the trading is done in Taub's name and there are

no short sales or canceled orders—that constitutes market manipulation.

In trying to capture all of Taub's trading under this one broad theory, the government has created a more serious problem for itself. For without the elements that the Court found problematic, it is left with only the generalized, stripped down market manipulation theory that the Court has already found wanting. *See* Hrg. Tr. at 39:8-13 ("I know you say they're manipulative, but . . . the first step is what's the exact theory of manipulation[?]"), 79:20-80:11. This theory—that the mere use of two accounts to simultaneously trade the same stock constitutes manipulation—can only survive this motion if it states "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[1]

It does not. The law is clear that the mere use of multiple accounts to make coordinated trades, in and of itself, is not manipulative. *GFL Advantage Fund Ltd. v. Colkitt*, 272 F.3d 189, 210 (3d Cir. 2001); *see also ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1237 (C.D. Cal. 2015). The Supreme Court has held that "'[m]anipulation' is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by *artificially* affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (internal quotation marks omitted) (emphasis added). In the Third Circuit, "the essential element of the claim is that *inaccurate* information is being injected into the marketplace." *Colkitt*, 272 F.3d at 205 (citation omitted) (emphasis

---

[1] As this Court recognized, Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions establishes a heightened pleading standard. Hrg. Tr. 68:14-17. This Court ruled that standard to be at least as high as the "plausibility" standard set forth in *Twombly* and its progeny. *Id.* at 68:20-69:8.

in original). Trading is not illegal because it affects market prices. *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 383 (2d Cir. 1973) ("The securities laws do not proscribe all buying or selling which tends to raise or lower the price of a security."). Indeed, because market prices represent a balance point between supply and demand, every order to buy or sell impacts the market to some degree. *See* [Dkt. 77 Ex. E] Expert Report of Haim Bodek ("Bodek Rpt.") ¶ 35.

Under this black letter law, real trades with third parties cannot be manipulative because they do not inject inaccurate information into the market. *Colkitt*, 272 F.3d at 210 n.10 ("[I]ncreasing the supply of stocks by selling them on the open market in legitimate transactions to real buyers does not *artificially* affect prices and therefore cannot be manipulative." (emphasis in original)). After all, open market transactions only take place if there is another market participant who is willing to take the other side of the trade. *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864 (7th Cir. 1995) (holding that massive short selling that drove down stock's price was not manipulative as a matter of law because it did not involve illusory transactions and dismissing complaint); *see also Santa Fe Indus.*, 430 U.S. at 476 (holding that allegations of unreasonably low offer price in a squeeze-out merger was not manipulative because it did not artificially affect market activity); *Schreiber v. Burlington N., Inc.*, 568 F. Supp. 197, 203 (D. Del. 1983), *aff'd,* 731 F.2d 163 (3d Cir. 1984), *aff'd,* 472 U.S. 1 (1985) (holding that manipulation was not alleged where "[a]ll activity of the defendants that could have conceivably affected the price of the El Paso shares was done openly"); *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 663 (D.N.J. 2009) (holding that depressing share price by flooding the market was not manipulative because it did not involve artificial

distortion).

Likewise, open market orders that realistically could be filled but are cancelled for lack of takers are not manipulative. *E.g.*, *CP Stone Fort Holdings, LLC v. Doe*, No. 16 C 4991, 2016 WL 5934096, at *6 (N.D. Ill. Oct. 11, 2016). The hallmark of manipulative trading strategies like matched orders, wash sales and spoofing is that the orders are illusory. *See* David Goodboy, *5 Market Manipulation Tactics And How To Avoid Them*, Nasdaq (April 11, 2018, 03:30:00 PM), https://www.nasdaq.com/article/5-market-manipulation-tactics-and-how-to-avoid-them-cm946807. In a spoofing scheme, for example, a trader will enter large buy orders at a price just below market that he attempts to cancel before they can be executed, thereby creating a false impression of buying interest and driving up prices. *United States v. Coscia*, 866 F.3d 782, 787 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 1989 (2018). What makes the scheme illegal is that the offer injects false information into the market, creating artificial prices. *Id.* Similarly, in matched or wash trades, the trader essentially "sells" shares to him or herself, creating the false impression of trading activity that is not real. *See, e.g., United States v. Mulheren*, 938 F.2d 364, 371 n.5 (2d Cir. 1991).

In contrast, "passive" or "resting" orders that other market participants can act on—the only kind of orders alleged here—are not manipulative, even if they go unfilled and are later canceled. *CP Stone* makes the point. The complaint there alleged that the defendants had entered "deceptive orders" that they would cancel after the market reacted to them, substituting in their place "aggressor" orders in the other direction to take advantage of the market move. 2016 WL 5934096 at *2. Finding that the allegations failed to state a claim for market manipulation, the court

explained:

> just calling an order deceptive does not make it so.
> According to the complaint, all of the so-called "Deceptive
> Orders" were passive, or resting orders, meaning they
> remained on the order book until they were either matched
> up with a counter-party offer, or cancelled. . . . In this
> sense, all of the offers or bids were legitimate and could
> have been matched at any time by a willing participant
> placing an aggressive order. And, had they been so
> matched, the market reaction would have been legitimate.
> Indeed, the complaint is devoid of any allegation that
> defendant refused to execute on any matched orders. Nor
> is there any allegation of how many orders were executed,
> how long the ultimately cancelled orders had remained
> resting and available for execution prior to cancellation, or
> whether the platform rules required the orders to be
> exposed further. . . . [P]laintiff's theory boils down to an
> allegation that "if a subset of orders was ultimately
> cancelled, those orders, in hindsight, must never have been
> intended to be executed."

*Id.* at *6; *see also Coscia*, 866 F.3d at 797 n.64 (distinguishing the trading in *C.P. Stone* from spoofing); *CP Stone Fort Holdings, LLC v. Doe* (*CP Stone II*), No. 16 C 4991, 2017 WL 1093166, at *4 (N.D. Ill. Mar. 22, 2017) (sustaining amended complaint because plaintiff's additional allegations that deceptive orders were shielded behind smaller legitimate offers adequately pled spoofing that "injected inaccurate information into the market").

The law is clear: real offers to buy or sell stock on the open market are not manipulative.[2] Yet the government's entire theory now hinges solely on the use of two accounts to trade the same stock, with one taking advantage of price changes caused by *real trades* executed in the other. *See* Gov. Mem. at 30-31. Indeed, the

---

[2]  This is not changed by their cancellation following non-acceptance.  Indeed, such a rule would mean that an order could never be cancelled once placed.

government now trumpets that a CTE is merely and simply any instance where "two accounts are trading at the same time in one stock with one account . . . profiting from the movement in the price of the stock caused by the other account." *Id.* No longer are short sales or canceled orders or straw accounts required to make a CTE. *See id.* at 30-31, 72-74. Instead, despite spending much of its original and amended complaints, as well as its brief in defense of the initial complaint, emphasizing their importance, the government only now owns that a CTE is nothing more than coordinated—but real—trading in two accounts.

No aspect of such trading is, without more, manipulative. In *Colkitt*, the Third Circuit held execution of real trades cannot, as a matter of law, be manipulative. 272 F.3d 210 n.10. There is also nothing inherently manipulative in using multiple accounts to trade the same stock. *ScripsAmerica*, 119 F. Supp. 3d at 1237 (holding that "the mere use of three trading accounts—two in [one] name and one in [another]—does not evidence market manipulation in and of itself" because "many traders . . . use multiple accounts to place orders"); *see also Colkitt*, 272 F.3d at 210) (rejecting inference that use of multiple accounts to trade small cap stocks constituted evidence of manipulation).

Despite ample opportunity to do so, the government's 170-page Amended Complaint and 78-page Opposition Brief opposing Taub's motion utterly fail to do the one thing that the Court required and the law demands: explain *how* Taub's executed trades and resting, passive orders that were in no way illusory constitute market manipulation. Indeed, in all 248 cumulative pages there is but one attempt. Buried deep within the paragraph of the Amended Complaint setting forth the definition of a CTE, and surrounded by a great deal of conclusory rhetoric about

falsity and artificial influence that the government hopes can substitute for actual allegations of manipulation,[3] the government states that the "trades of Taub and his Co-Conspirators in a security were not intended to be bona fide orders *reflecting a view that the security was under- or over-valued*." Am. Compl. ¶ 27 (emphasis added). In other words, the government is saying that only orders "reflecting a view that [a] security [is] under- or over-valued" are bona fide. All others are manipulative. Not only is this proposition a legal conclusion without any support that the Court should disregard in ruling on a motion to dismiss, *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), but it also stands in stark opposition to the law, to common experience, and to the government's own alternate definition of the same term later in the Amended Complaint.

First, as detailed above, the notion that trading is manipulative if done for any reason other than to take advantage of a perceived market under- or overvaluation of the stock runs smack into the requirement that manipulative trading must, as a matter of law, involve an *artificial* impact on stock prices caused by illusory, rather than real, trading. *See Colkitt*, 272 F.3d 189, 210 & n.10. If an offer to trade is real, the trader's subjective evaluation of the stock's value is irrelevant, and certainly does not transform a legal trade into an illegal one. Beyond the fact that this is the law, it is also obviously correct. The government's "good deals only" definition would classify all kinds of innocent trading as manipulative, wreaking havoc on markets.

---

[3] These bald assertions, together with the scores of others like them, including the government's claim that CTEs "by definition, are manipulative," Gov. Mem. at 31, are legal conclusions, not allegations of fact, and thus need not be taken as true on a motion to dismiss. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

For example, a homebuyer who believes her shares of Amazon are undervalued but sells them anyway to make a down payment would be guilty of making non-bona fide, and therefore manipulative trades. Indeed, even the government does not stand by this absurd definition, contradicting it later when it states that a "non-bona fide order" is one "that, at the time it was placed, a trader intended to cancel before execution." Am. Compl. at 59 n.3. Of the government's two competing definitions, this one, and only this one, captures manipulative trading, since orders never intended to be filled inject false information into the market, and thus create artificial pricing. Unfortunately for the government, it has not made (and obviously cannot make) any such allegation here. To the contrary, the government concedes that Taub's cancelled orders were genuine when made. [4]

---

[4] Despite this, and despite its express disavowal of their relevance, the government does discuss cancellations in the Amended Complaint. *See* Am. Compl. ¶¶ 27, 29. It does not, however, allege that cancelled orders were in any way illusory. *Id.* Indeed, as discussed further below*,* it admits that, unlike in a spoofing scheme, Taub's "loser" trades—the only ones that it alleges were cancelled—were intended to be executed in order to remove other offers from the market. *See id.* ¶¶ 27, 29, 37(a). The paragraphs discussing cancelations do not allege that the orders were intended to be canceled from the outset, or that they were illusory or incapable of being executed, just that unexecuted orders would be canceled after Taub was done trading in that particular security—exactly as Taub explained in his memorandum in support of this motion. Mem. at 30 n.9. Thus, as in *CP Stone*, the government fails to plead facts showing that the canceled orders injected false information into the market.

Moreover, while the parties now agree on the canceled orders' irrelevance, it is nevertheless worth noting that the government's own data shows that Taub's cancelation rate was far *lower* than the market average. *See* Mem. at 30 n.9. High-frequency traders, who make up over half of all trading volume, often cancel almost 99% of their orders. *See* Mary Schapiro, Chairman, U.S. Sec. & Exchange Comm'n, "Strengthening Our Equity Market Structure" (speech of Sep. 7, 2010), available at https://www.sec.gov/news/speech/2010/spch090710mls.htm ("[H]igh frequency trading firms can generate more than a million trades in a single day and now

In stark contrast to a spoofing or wash sale case, the Amended Complaint details that Taub's trades were intended to be executed. According to the government, Taub's "trading techniques" included:

> purchasing relatively large numbers of shares in a Winner Account with the benefits of Price Improvement and Enhanced Liquidity, and then, using Direct Access Trading, placing trades in a Loser Account that *removed offers at lower prices* for the purpose of artificially driving the price up. Once the bid rose, the large position in the Winner Account would be sold for a profit.

Am. Compl. ¶ 37 (emphasis added). This assertion that Taub's actual, consummated trades in the "Loser account" "artificially" moved the market highlights the government's fundamental misunderstanding of what it must allege to make out a viable theory of manipulation. By alleging that Taub placed orders to remove other offers from the market—*i.e.*, specifically because he intended to have them executed—the government admits that his orders were bona fide under the controlling law. As such, they simply cannot support a market manipulation claim.[5]

---

represent more than 50 percent of equity market volume. And many firms will generate 90 or more orders for each executed trade."). In contrast, only 25.93% of Taub's orders were canceled, including less than one-third (31.98%) in his so-called "loser" accounts. Declaration of Haim Bodek, Ex. A ¶¶ 9-10. In some accounts the figure was much lower, and some had no canceled orders at all. *Id.* ¶ 11. Taub's cancellation rate was also dramatically lower than is found in spoofing strategies. In *Coscia* for example, more than 99% of orders were cancelled. 866 F.3d at 796.

[5] The government's throw-away argument that Taub cannot challenge the sufficiency of its allegations because the grand jury has already found his trading to be manipulative is nonsense. Gov. Mem. at 33. To begin, the Indictment was presented to the grand jury in early 2018, when the government still adhered to the now-abandoned theory set forth in its initial complaint. *See* Indictment, United States v. Taub, No. 18-cr-79 (D.N.J. Feb. 21, 2018), ECF No. 52. Indeed the Indictment itself contains allegations about Taub's "secret[] fund[ing] and control[]" of the brokerage accounts, *id.* ¶ 2, describes the use of straw accounts, *id.* ¶¶ 10, 13,

That Taub figured out how to profit from a trading strategy of coordinated—but real, open market, bona fide—trading does not make him a market manipulator; it makes him a capitalist. *See U.S. Commodity Futures Trading Comm'n v. Wilson*, Civ. No. 13-7884, 2018 U.S. Dist. WL 6322024, at \*21 (S.D.N.Y. Nov. 30, 2018) ("It is not illegal to be smarter than your counterparties in a swap transaction, nor is it improper to understand a financial product better than the people who invented that product.").[6] Taub's strategy, as detailed by the government, Am. Compl. ¶ 37a,

---

and only includes examples of CTEs involving short selling. *See id.* at 14. Moreover, the government has provided neither Taub nor the Court with any information about what it told the grand jury about his trading. The claim that Taub cannot challenge its current broad theory of manipulation because a much narrower theory was apparently approved by the grand jury is clearly wrong.

[6] Taub's strategy identified and exploited a weakness in the way a handful of extraordinarily large market makers priced certain shares. In pursuing a near no-risk, high-profit strategy to take advantage of what market makers call "dumb money" (the retail orders of average investors), these mega-market makers paid retail brokerages (TD Ameritrade, eTrade, Charles Schwab, etc.) for the right to fulfill their customers' orders, a practice called "payment for order flow." Bodek Rpt. ¶¶ 23-24, 32.

What Taub discovered was that these sophisticated market makers did not always accurately take into account the level of liquidity supporting a stock's price before offering to sell large quantities at that price. This meant that they sometimes mispriced stocks. Using professional trading tools that allowed him—unlike the so-called "dumb" retail money—to see the liquidity conditions supporting (or not supporting) prices, Taub exploited the mispricing. If he saw, for example, that a stock was trading at a certain price, but that only a few shares were on offer at that price in the "professional" marketplace, Taub would buy a large quantity of that stock in retail accounts (and thus, from the mega-market makers at their price), and then purchase the few shares supporting that price in his non-retail "professional" account, causing the price to rise. Once the mega-market makers corrected their prices to reflect the actual market conditions following these purchases, Taub sold the stocks back to them at a profit. *See* Taub Mem. at 30 n.9, 36 n.10. At that point,

was a "legitimate trading strateg[y] intended to anticipate and respond to market forces." *Colkitt*, 272 F.3d 205. He did not "deceive purchasers and sellers" with non-bona fide orders as the government argues. Gov. Mem. at 22-23. To the contrary, his strategy was wholly dependent on the *execution* of his open market, bona fide orders. *See* Am. Compl. ¶ 37. In sum, because the government cannot allege Taub injected inaccurate information into the market, it cannot adequately allege market manipulation.[7]

---

he canceled any remaining orders because he did not wish to buy at the corrected price.

While often successful, despite Taub's insight, executing his strategy still carried significant risk. If Taub misread the market, as he frequently did, he would lose money—*i.e.*, trade at a combined loss in his direct access "Loser" and retail "Winner" accounts. *See* Complaint, S.E.C. v. Taub, No. 16-cv-9130 (D.N.J. December 12, 2016, ECF No. 1 at ¶ 18 (alleging that roughly 20% of Taub's CTEs lost money).

[7] Taub's strategy of beating the mega-market makers at their own game also shows the "legitimate business reason," Gov. Mem. at 53, for his using multiple accounts in various names. As explained above, the mega-market makers profit off the so-called "dumb money" and pay brokerages handsomely for the right to do so. Bodek Rpt. ¶¶ 23-24, 32. At the same time, the mega-market makers try to avoid having professional or "toxic" investors they cannot exploit in their order flow. *Id.* ¶ 32. Accordingly, the mega-market makers pressure the retail brokerages to exclude savvy traders like Taub from their platforms, a request to which the brokerages often accede in order to keep the mega-market maker happy (and paying). *Id.* ¶¶ 32-33.

When Taub's brokerage accounts were shut down for this reason, he created corporate accounts or recruited associates to regain access to the brokerage platforms. While arguably deceptive, such accounts were neither illegal nor manipulative because no deception reached the market.  To use an analogy, Taub was like a gambler counting cards in a casino. Card counting is not illegal, but the house has a financial incentive to identify and exclude those doing it. *See Hoagburg v. Harrah's Marina Hotel Casino*, 585 F. Supp. 1167, 1170 (D.N.J. 1984). Often, card counters who are caught will use a disguise to get back into the casino. This,

## II.   AS THE COURT HELD, THE GOVERNMENT MUST SHOW THAT IT CAN TRACE THE ASSETS IT HAS SEIZED TO MANIPULATIVE TRADING.

At oral argument and in its written order, the Court stressed repeatedly that the government must trace the assets it wishes to seize to a "viable" theory of market manipulation and it must do so "precisely." Hrg. Tr. at 39:8-13, 81:1-7; *see also* Taub Mem. at 17-18 (collecting examples).

To begin, the government can only meet this burden if it pleads a viable theory. And as explained above, by abandoning the pattern alleged in its original Complaint and broadening its theory to the point where it now disavows the importance of the conduct it originally cited—short sales, straw accounts, warning letters—the government is wholly unable to get past this initial, most basic hurdle. But the government goes further, explicitly defying the Court's instructions by arguing that it "does not have to satisfy any tracing requirements to satisfy" Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset

---

too, is perfectly legal. Taub disguised that the accounts were his for the same purpose—he had figured out a legal way to beat the mega-market makers and he wanted to avoid their efforts to shut him down.

If the mega-market makers or brokerages wish to sue Taub for trying to avoid their efforts to exclude him, they may. And if the government believes he tricked them into providing something of value—brokerage services for which he paid—in a way that constitutes a fraud, they can charge that case. What they cannot do is what they have done here—try to charge real, open market orders and executed trades as manipulation by "dirtying up" Taub with allegations about conduct that the government itself now states is not the "gravamen" of its market manipulation allegation.  Put simply, Taub's use of "disguised" accounts, by placing real orders and executing real trades, did nothing more than allow him to trade. He certainly did not deceive the market. Indeed, because a trader's name is never disclosed to the market, it made no difference to market participants whether Taub traded in his own name or in someone else's. *See* Dkt. 77-1 at 20-21.

Forfeiture Actions ("Rule G"), Gov. Mem. at 9, 16.

Beyond defying the Court's order, the government's no-need-to-trace assertion is wrong. This Court correctly applied Rule G(2), especially where, as here, the government would also be required to perform the tracing anyway under a *Monsanto* analysis. Rule G(2)(f) requires a forfeiture complaint to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Of course, to win at trial, the government must trace the assets. 18 U.S.C. § 981(a)(1)(A) (only property "involved in" or "traceable to" certain criminal activity is forfeitable under); *United States v. $8,221,877.16 in U.S. Currency ($8,221,877.16 I)*, 330 F.3d 141, 158 (3d Cir. 2003) (interpreting this language to mean that "[i]n forfeitures under section 981, the government is required to trace the seized property directly to the offense giving rise to the forfeiture."); *see also United States v. Voigt*, 89 F.3d 1050, 1087 (3d Cir. 1996) (same). Therefore, as this Court held, even at the pleading stage, the government must show that it will be able to meet its tracing burden.

In *$8,221,877.16 I*, for example, the government sought forfeiture under both § 981 and the substitute asset provision of 18 U.S.C. § 984. 330 F.3d at 144. On appeal, the Third Circuit found the substitute asset provision inapplicable and remanded the case with instructions to dismiss the case "if the government cannot fulfill the tracing requirement under section 981." *Id.* at 161. The district court in that case then did exactly that. Although the government had alleged a broad conspiracy to launder drug proceeds, the court found that the government did not "provide any specific allegations that any of the sources of the deposited money was engaged in the specified unlawful activity." *United States v. $8,221,877.16 in U.S.*

*Currency ($8,221,877.16 II)*, No. 00-cv-2667, at *17 (D.N.J. July 7, 2004). Similarly, the government alleged that it could trace $419,748.37 to a named drug trafficker and that these funds were "drug proceeds used to further facilitate money laundering activities," but the court found the allegations inadequate because they did not link the funds to specific drug transactions, such as by specifying the "type of narcotics involved, the time period when the alleged violation occurred and . . . the individuals involved." *Id.* at *15-16.

The court in *United States v. One Partially Assembled Drag Racer* reached the same result. There, the court found that the complaint alleged "the predicate violations . . . with sufficient particularity" and stated that the property in question was "traceable to" those violations. 899 F. Supp. 1334, 1341 (D.N.J. 1995). Nevertheless, it dismissed the complaint because the government gave "no indication that it [would] be able to trace the proceeds of claimant's alleged criminal activity to his purchase of the Property." *Id.* These cases show, therefore, that where the government is unable to trace the seized funds to concrete offenses, dismissal is proper.

The Fourth Circuit's opinion in *United States v. Mondragon*, on which the government heavily relies, is not to the contrary. *Mondragon* held that "the complaint must at bottom allege facts sufficient to support a reasonable belief that the property is subject to forfeiture"; in other words, that the government will prevail on the merits. 313 F.3d 862, 865–66 (4th Cir. 2002). If the government cannot trace the assets, it cannot meet this standard. *See United States v. One Gulfstream G-V Jet Aircraft,* 941 F. Supp. 2d 1, 16 (D.D.C. 2013) (applying *Mondragon* to hold that "[a]bsent some specific indication that the [property] is derived from or traceable to

illicit activity, the complaint must be dismissed.").[8]

The government also argues that it does not need to trace the seized assets to Taub's allegedly manipulative trading because Taub has no legal income, glibly comparing him to professional drug dealers. Gov. Mem. at 12-13. But this assumes that all of Taub's trading was illegal, which, for all the reasons explained above, is the very showing they have failed to make. And, as demonstrated at length in the prior briefing and argument in this matter, much of Taub's trading does not meet the pattern that the government previously alleged formed the basis of its claim. In short, the government cannot just say that all of his trading is illegal (as all drug dealing is) and then seize the proceeds of all of his trading.[9] As detailed above and directed by the Court, the government has to show *how* specific trades were illegal. Indeed, even under the government's new expansive theory, 9% of Taub's trades still are not alleged to be illegal. Gov. Mem. at 28, 51.

---

[8] The other out-of-circuit cases cited by the government are also readily distinguishable. Several, for example deal with sufficiency of the evidence rather than pleading standards, *see United States v. $506,069.09 Seized From First Merit Bank*, 664 F. App'x 422, 433 (6th Cir. 2016); *United States v. $2,200,000 in U.S. Currency*, No. 12-cv-3501, 2014 WL 1248663, at *13 (D. Md. Mar. 26, 2014), or with requests for sanctions. *United States v. Any & All Funds on deposit at JPMorgan Chase*, No. 12-cv-7530, 2013 WL 5511348, at *5 (S.D.N.Y. Oct. 2, 2013).

[9] This critical distinction—all drug dealing is illegal; all trading is not—distinguishes all of the drug dealing cases upon which the government relies. *See United States v. Two Parcels of Real Property*, 92 F.3d 1123, 1127 (11th Cir. 1996) (government alleged that income was from drug dealing); *United States v. $2,200,000 in U.S. Currency*, No. 12-cv-3501, 2014 WL 1248663, at *13 (D. Md. Mar. 26, 2014) (government made specific allegations plausibly showing that each drug dealt was illegal).

17

Finally, the government ignores that tracing is required under the *Monsanto* analysis, which requires the government to show "probable cause . . . that the assets in dispute are traceable or otherwise sufficiently related to the crime charged." *Kaley v. United States*, 571 U.S. 320, 324 (2014); *see also, e.g.*, *S.E.C. v. Coates*, No. 94-cv-5361, 1994 WL 455558, at *3 (S.D.N.Y. Aug. 23, 1994) (ordering a hearing to determine whether "the SEC has made a showing that the frozen assets are traceable to fraud").[10] Taub has followed the Court's lead in challenging the adequacy of the Amended Complaint before re-raising his *Monsanto* motion, *see* Hrg. Tr. 81:17-20, 83:9-20, but would renew that motion if his motion to dismiss were denied. Thus, whether under Rule G(2) or under *Monsanto*, the government cannot restrain Taub's assets before trial without showing they are traceable to specific illegal conduct.

## III.   EVEN IF THE GOVERNMENT COULD ALLEGE THAT THE TRADES WERE MANIPULATIVE, IT DOES NOT TRACE THE SEIZED FUNDS TO TAUB'S TRADING.

This Court held that the government must "sufficiently plead allegations to trace the alleged improper conduct to the forfeitable property." Hrg. Tr. at 79:9-10. That correctly states the tracing standard: the funds must be traced to the offense. In

---

[10] Under *United States v. Monsanto*, 491 U.S. 600 (1989), and its progeny, a claimant can move for a release of funds needed to pay for counsel in a parallel criminal case. If the claimant shows need and makes a prima facie claim, the government must then show "probable cause to think (1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime." *See Kaley*, 134 S. Ct. at 1095.

Taub's original motion to dismiss also sought a *Monsanto* hearing. Dkt. 77. The Court was satisfied Taub had shown financial need, Hrg. Tr. 86:20-87:1, but deferred the probable cause question until after the government amended its complaint. *Id.* at 81:17-20, 83:9-20. The Court also recognized the substantial overlap between *Monsanto* tracing and the forfeiture pleading standard. *See id.* at 6:3-19, 34:2-10, 34:15-18.

this case, the underlying offense is the alleged manipulative trading.

In its response, after declaring that tracing is unnecessary in contravention of the Court's "statement" to the contrary, Gov, Mem. at 49 n.9, the government argues in the alternative that the Amended Complaint complies with the Court's instructions by "trac[ing] the flow of funds painstakingly" in a "model of tracing." *Id.* at 36. Taub's initial brief in support of this motion explains at length why this is not so and identifies tracing defects with regard to every single account and asset listed in the Amended Complaint. Taub Mem. at 19-25.

For many assets, the government does no tracing at all. *See id.* at 25 (collecting examples). For many others, the tracing is entirely conclusory, alleging only that certain assets are "traceable to proceeds of the Manipulation Scheme" or can be traced to accounts "in which illegal Coordinated Trading Events occurred." *See id.* at 20-22. And for all the assets the government claims to trace, the Amended Complaint traces solely to bank and brokerage accounts rather than to specific allegedly manipulative trades. *See id.* at 23-25. Such tracing is inadequate because "[b]ank accounts do not commit crimes; people do. It makes no sense to confiscate whatever balance happens to be in an account bearing a particular number, just because proceeds of crime once passed through that account." *Voigt*, 89 F.3d at 1087 (quoting *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992)). The Amended Complaint violates this fundamental rule consistently and repeatedly. In fact, the government has never traced a single seized dollar to a particular allegedly manipulative trade or CTE.

The government's Opposition Brief does nothing to rebut this argument (nor could it). Instead, the government simply ignores the problem and doubles down on

its deficient tracing. For example:

- The government claims that it "thoroughly tracks the sources of the defendants in rem, with specifics about accounts funds were transferred between, dates of transactions, and the amounts of transactions." Gov. Mem. at 11. Again, this is tracing to accounts and transfers between accounts, not to allegedly manipulative trades.

- The government argues that "[t]he defendants in rem consist of funds that can ultimately be traced back, through a series of transactions, to accounts held by Taub or his nominees, and beyond that to transfers made to those accounts by Taub, which are attributable to Taub's Manipulation Scheme." *Id.* at 15. Again, this is conclusory tracing to a broad "manipulation scheme," not to specific allegedly manipulative trades as required by this Court, following the Third Circuit's decision in *Voigt*.

- And the government argues it has done enough to trace to an account that "was funded largely by brokerage accounts used for CTEs," *Id.* at 38, failing to trace to specific allegedly manipulative trades yet again.[11]

Thus, the government has failed to trace the assets it has seized to specific manipulative trades, as required by the Court's order and Third Circuit law.

---

[11] The government misquotes and mischaracterizes the portion of Taub's memorandum addressing these deficiencies. For example, it claims that Taub says the Amended Complaint "'alleges that [one bank account] received funds from four brokerage accounts but nothing more.'" Gov. Mem. at 37 (supposedly quoting Taub Mem. at 21). What Taub's memorandum actually says is that "[a]lthough the government lists [a checking account] and four brokerage accounts as the source of these funds, it never traces the funds to manipulative trading in those accounts." Taub Mem. at 21. Of course Taub recognized that some parts of the Amended Complaint describe transfers between accounts or baldly assert that certain brokerage accounts conducted CTEs (that was his argument); but there is a big difference between tracing funds to a brokerage account that conclusorily is alleged to have made "CTEs" and tracing to actual manipulative trading. The government's misquotation, and the similar mischaracterization of Taub's arguments in the subsequent paragraphs of the Opposition Brief, underscore that the government has not performed the kind of tracing this Court demanded and the law requires. *Compare* Gov. Mem. at 37-39 *with* Taub Mem. at 19-25.

## IV. THE GOVERNMENT'S ALLEGATIONS OF MONEY LAUNDERING DO NOT SAVE ITS TRACING DEFICIENCIES.

The Court previously held that even under a money laundering theory, the government would need to allege a viable theory of manipulative trading and trace the assets to the offense. *See* Hrg. Tr. at 42:5-13 ("Whether you then get into the money-laundering or not, I still have to work it back to the underlying scheme. And then where did the money flow from there."). This too is legally correct. The gravamen of money laundering is the use of financial transactions to carry out or conceal other crimes. *See* 18 U.S.C. § 1956(a)(1)(A) & (B). Thus, there can be no money laundering without a predicate offense. Further, as this Court correctly held, forfeiture based on money laundering is subject to the same traceability requirement as other crimes. *See* 18 U.S.C. § 981(a); Hrg. Tr. at 42:5-13.

The government ignores the Court's decision here as well, arguing that tracing is unnecessary because "the same property would be subject to forfeiture under the money laundering theory" without it. Gov. Mem. at 17. The government's claim that the magic words "money laundering" permit it to seize whatever assets it likes, be they "clean" or "dirty," is legally unsound, as the Court has already held. *See* Dkt. 84 at 42 n.9, 48; Hrg. Tr. at 40:11-41:2, 42:5-13. Indeed, the forfeiture statute applies precisely the same traceability requirement to money laundering as it does to any other offense. *See* 18 U.S.C. § 981(a). In fact, the two key Third Circuit opinions requiring tracing, *Voigt* and *$8,221,877.16 I*, were both money laundering cases. *$8,221,877.16 I*, 330 F.3d at 144; *Voigt*, 89 F. 3d at 1087-88. Despite the government's protestations to the contrary, this Court got it right: the government must trace the seized funds to specific allegations of money laundering.

The cases the government cites—which all stand for the unsurprising

proposition that otherwise clean funds become forfeitable if used to launder the proceeds of a predicate offense because those funds are now traceable to the distinct crime of laundering—in no way undermine the Court's holding. *United States v. Baker*, 227 F.3d 955, 965 (7th Cir. 2000) (clean funds were used to process payments for prostitution); *United States v. Coffman*, 859 F. Supp. 2d 871, 881-82 (E.D. Ky. 2012) ("The presence of the legitimate funds disguised the nature and source of the tainted funds and disguised the transaction as legitimate."); *United States v. Clarkson Auto Elec., Inc.*, No. 10-cr-6111, 2012 WL 345911, at *7 (W.D.N.Y. Feb. 1, 2012) (finding "probable cause to believe that the seized accounts . . . constitute property involved in money laundering offenses or traceable to such property.").

To seize assets under a money laundering theory the government must plausibly allege: (1) a predicate criminal offense; (2) financial transactions to carry out or conceal that offense; and (3) that the seized assets are traceable to those laundering activities. *See United States v. Bansal*, 663 F.3d 634, 645 (3d Cir. 2011) (describing the elements of money laundering); *Voigt*, 89 F.3d at 1087 (requiring traceability where forfeiture is based on money laundering). Here, the government has failed to allege any one of them.

First, the Amended Complaint fails to link the supposedly laundered assets to a predicate offense because its allegations of manipulative trading are inadequate for the reasons discussed above. *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, (S.D.N.Y. 2008), is on point. In that case, the government alleged that seized funds were narcotics proceeds laundered through a "black market peso exchange" scheme. *Id.* at 367-68. The complaint described the general "exchange" scheme and various money transfers, but the court dismissed it for failing to connect

the particular funds seized to narcotics activity. *Id.* at 373-74. The complaint contained only "bare allegations" that "the [funds] constitute[d] criminally derived property derived from narcotics trafficking and the laundering of monetary instruments." *Id.* at 374. So too here. Although the government describes various banks transfers, since it cannot plausibly allege that the funds were derived from market manipulation, moving them around cannot constitute money laundering. *See* Hrg. Tr. at 42:5-13 (this Court noting that money laundering must be "work[ed] back" to the "underlying scheme").

Second, the government fails to detail how Taub's bank transfers carried out or concealed manipulative trading. As with any offense, the government must show that the assets were "involved in" money laundering. *See* 18 U.S.C. § 983(c)(3); *Voigt*, 89 F.3d at 1087. Even under the broader "facilitation theory" adopted by other courts (but not the Third Circuit), the property must "make[] the prohibited conduct less difficult or more or less free from obstruction or hindrance." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003).

The government has not pleaded with the requisite particularity how the seized assets were involved in money laundering. For example, in many places the government simply asserts that certain transfers "were money laundering transactions," *e.g.*, Am. Compl. ¶ 92, or that certain transfers were done "in order to promote and to conceal the scheme." *E.g.*, *id.* ¶ 26; *see also id.* ¶¶ 82, 250. But this kind of conclusory "formulaic recitation of the elements" is "insufficient" as a matter of law. *See Twombly*, 550 U.S. at 555. The government also relies on allegations that Taub commingled innocent funds with proceeds of the allegedly manipulative trading. Gov. Mem. at 63-64. But even if the government could plausibly allege that

23

specific trades were manipulative, "[m]erely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture." *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997); *see also Voigt*, 89 F.3d at 1087; *Puche*, 350 F.3d at 1153; *$448,342.85*, 969 F.2d at 476-77.

Finally, the government fails to trace any seized assets to any specific instances of money laundering. As with any crime, as this Court and the Third Circuit held, where laundering provides the basis for forfeiture "the government is required to trace the seized property directly to the offense." *$8,221,877.16 I*, 330 F.3d at 158; *see also Voigt*, 89 F.3d at 1087; Hrg. Tr. at 42:5-13. The government does not do so. Instead, it merely "traces" the funds to various bank accounts or baldly asserts that Taub's investments in various LLCs were money laundering transactions. *See* Taub Mem. 28-29 (collecting examples).

The government tries to defend its "faux tracing" by saying that the conclusory allegations are "merely introductory paragraphs for sections of the complaint that contain detailed tracing." Gov. Mem. at 39-40. In the very next paragraph, however, the government says that it does not need to provide detailed tracing of Taub's LLC investments because "[t]he introductory section regarding Taub's partnership investments explains that Taub's investments are traceable the proceeds he obtained from his market manipulation scheme." *Id.* at 40. Such circular tracing is obviously inadequate.

In sum, money laundering allegations cannot justify the seizure of innocent funds or the seizure of funds without tracing. Because the government fails to trace Taub's assets to money laundering, even after the Court required it to do so, those claims must fail.

## V.   TAUB HAS SHOWN THAT THE GOVERNMENT HAS SEIZED MILLIONS OF DOLLARS IN PROCEEDS THAT FALL OUTSIDE EVEN THE INITIAL PATTERN ALLEGED.

In his initial brief in support of this motion, Taub identified $18,787,131 in profits from trades that fell outside the initial pattern alleged to be manipulative. Taub Mem. at 30-39. This figure is not surprising given that the government conceded that 70% of Taub's trades did not fit the "typical" CTE pattern described in its original complaint. *See* Hrg. Tr. at 30:21-24. Since neither the Amended Complaint nor the Opposition Brief plausibly alleges that these trades were manipulative, the proceeds of these trades, at a minimum, must be released.

First, Taub identified $1,753,407 from trades during 2014 and 2015 that the government does not even allege to be part of CTEs. Taub Mem. 31-32. These were identified by comparing the brokerage data to the CTE lists provided in Taub's criminal case. And this amount is now corroborated by the government's more recent concession that almost 9% of Taub's trades were not "CTEs" at all. Because it cannot even attempt to allege that these trades were manipulative, the government repeats its position that it can restrain entirely clean money at the pleading stage or seize it on a money laundering theory. Gov. Mem. at 70-71. But this argument is refuted above and inconsistent with the Court's order specifically requiring the government to perform principled tracing analysis that "precisely" traces specific seized assets to manipulative trades.

Second, Taub identified $7,705,245 earned from trades using only brokerage accounts openly and notoriously associated with him. Taub Mem. at 32-33. These trades fell outside the government's original theory that alleged "straw" and "nominee" accounts were an essential part of the manipulation scheme. *See* Am. Compl. ¶¶ 42-61, 165-72, 200-346. In its Opposition Brief, the government

responds, strangely, by repudiating that theory and saying that "Taub's trading in his own name is the gravamen of the criminal conduct in this case." Gov. Mem. at 72; *see also id.* ("The government has defined CTEs in such a way that trading in a nominee name is not an element either of market manipulation broadly, or part of the government's definition of CTEs."). The government cannot rely on such conduct to convince this Court to decline to dismiss the original complaint but then minimize that allegation when Taub shows that he earned much of his trading proceeds from "CTEs" conducted entirely in accounts openly in his name. These funds should be released.

Third, Taub identified $9,822,853 in profits from trades that involved no short sales. Taub Mem. 34-36. As the Court will recall, short sales were a key element of the manipulation theory alleged in the original Complaint, *see* Compl. ¶¶ 23-31, and were part of the trading pattern that the Court found plausibly alleged manipulation. And, at least in the Amended Complaint (if not its brief), the government still attaches significance to short sales: all five examples of CTEs listed there involved them.[12] In its attempt to save its unsupportably broad definition of manipulative trading (so that it can claim all of Taub's trading is manipulative and therefore seize all of his assets), the government now says that short selling is no longer a feature of its manipulative trading theory. Gov. Mem. at 74. The government only does this now that Taub has definitively demonstrated that almost $10 million of the proceeds from just the first two years of the alleged scheme were from "long only" CTEs. The

---

[12] As explained in Taub's initial memorandum in support of this motion, the Amended Complaint provides absolutely no details about these "example" CTE trades, but Taub's expert determined that each involved short sales. *See* Taub Mem. at 16 n.6, 36.

government cannot have it both ways—it cannot use the allegation of short sales to persuade the Court not to dismiss the original Complaint and then say that short selling is unimportant when Taub shows that much of his trading did not involve it.

Fourth, Taub identified $9,291,552 he earned before receiving any warning letters from brokerage firms about his trading. Taub Mem. at 37-38. At least earlier in this litigation, and still in the Amended Complaint, the government advanced these warning letters as critical to its theory that Taub engaged in deceptive conduct. *See* Compl. ¶¶ 45-50; Am. Compl. ¶¶ 62-67. The warning letters were also an important factor in this Court's holding that the government had plausibly alleged manipulation. Hrg. Tr. 72:10-73:4. But now that Taub has established that he earned more than $9 million of the seized proceeds before any warning letters were issued, the government again reverses course and says Taub's alleged failure to heed such warnings is not a component of its manipulation theory. Gov. Mem. at 72. Once again, the government cannot have it both ways and these funds should be released.

Finally, the government argues that the mere fact that Taub could trace some of the proceeds to specific categories of trades proves that its Amended Complaint provided him sufficient facts to frame a responsive pleading and therefore should not be dismissed. But this argument conflates the fact-pleading standard with the motion-to-dismiss standard. The heart of Taub's motion is not that the government's allegations are unclear (though they are) but that they do not plausibly allege that Taub committed a crime nor adequately trace any assets to a crime—both of which this Court required the government to do, in no uncertain terms. To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. For all the reasons discussed above,

27

the government has failed to do so and the Amended Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should enter an order granting Taub's motion to dismiss the Amended Complaint and dissolving the Restraining Order. In the alternative, this Court should dismiss the Amended Complaint in part with respect to the proceeds of trades that, as set forth above and in Taub's memorandum dated February 6, 2019, are not plausibly alleged to fit within a viable theory of manipulation, and dissolve the Restraining Order commensurately.

Dated: May 13, 2019
Newark, New Jersey

Respectfully submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Jason R. Halpin
GIBBONS P.C.
One Gateway Center
Newark, N.J. 07102-5310
(973) 596-4500 (telephone)
(973) 596-0545 (facsimile)

s/ Jonathan R. Streeter
Jonathan R. Streeter
Roger A. Burlingame
Theodore E. Yale
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10025
(212) 698-3500 (Telephone)
(212) 698-3599 (Facsimile)

Attorneys for Claimant Joseph Taub