Not for Publication

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>ANY AND ALL OWNERSHIP INTEREST HELD IN THE NAME, ON BEHALF OR FOR THE BENEFIT OF JOSEPH TAUB, AND/OR JT CAPITAL LLC, *et al.,*<br><br>*Defendants.* | Civil Action No. 16-9158 (JMV)(JBC)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

Currently pending before the Court is a motion to dismiss the Amended Verified Complaint for Forfeiture *in Rem*, D.E. 130 (the "FAC"), made by Claimant Joseph Taub ("Taub" or "Claimant") pursuant to Supplemental Rule G(8)(b). D.E. 162. Taub also requests that the Court vacate the restraining order, at least with respect to some of the restrained property. Plaintiff (the "Government") opposed the motion, D.E. 175, and Claimant replied, D.E. 181.[1] The Court then held oral argument on December 20, 2019. For the following reasons, Taub's motion is **granted in part and denied in part.**

---

[1] Taub's moving brief, D.E. 162-1, is referred to as "Br."; the Government's opposition brief, is referred to as "Opp."; and Taub's reply brief, D.E. 181, is referred to as "Rep."

## I.    Factual Background[2]

This matter concerns an alleged securities fraud scheme, specifically, a market manipulation scheme (the "Scheme") through coordinated trading events ("CTEs"). As will be discussed, the Scheme itself was not overly complicated. Complications, however, arise from the number of trades involved, the number of accounts involved, and the number of persons involved. The FAC alleges that a successful CTE resulted in an average of profit of under $2,000. FAC ¶ 39. At the same time, the entire Scheme netted over $40,000,000 in profits according to the FAC. *Id.* ¶ 40. As a result, the Government contends that there were "at least 30,000" CTEs. *Id.* ¶ 39. Taub has also been indicted for the Scheme. Superseding Indictment, D.E. 86, United States v. Taub, No. 18-cr-79 (D.N.J. Oct. 23, 2019).

### A.    Superseding Indictment in Criminal No. 18-79

The Government has charged Taub in a Superseding Indictment under Criminal Docket Number 18-79. *Id.*.[3] The Superseding Indictment uses many of the same terms as found in the FAC, *id.* ¶ 1, and charges Taub with the same Scheme found in the FAC. Superseding Indictment, *Taub*, No. 18-cr-79. The Superseding Indictment sets forth the following counts against Taub: Count 1 – from 2013 to in or about 2016, conspiracy to commit securities fraud in violation of 18 U.S.C. § 1349; Count 2 – securities fraud in violation of 18 U.S.C. § 1348; Count 3 – conspiracy to commit securities fraud in violation of 18 U.S.C. § 371; Count 4 – securities fraud in violation of 15 U.S.C. § 78j(b); Count 5 – conspiracy to defraud the United States in violation of 18 U.S.C.

---

[2] The information on which the Court derives the factual background is discussed later in the Opinion.

[3] The Court may take judicial notice of the Superseding Indictment. *Liberty Int'l Underwriters Can. v. Scottsdale Ins. Co.*, 955 F. Supp. 2d 317, 325 (D.N.J. 2013). As will be explained, the Superseding Indictment limits Taub's ability to contest certain portions of the FAC.

§ 371. *Id.* The Superseding Indictment also contains forfeiture allegations. *Id.* at pp. 23-24. The Fifth Count is not applicable to the FAC. The Superseding Indictment does not charge Taub with money laundering.

### B. Amended Verified Complaint for Forfeiture *In Rem*

The *in rem* Defendants consist of sixty-six entities and fifty-three bank or brokerage accounts. FAC at pp. 10-33. The FAC seeks forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C). *Id.* ¶¶ 1, 7. In addition to securities fraud, the FAC alleges money laundering violations contrary to 18 U.S.C. §§ 1956, 1957. *Id.* ¶ 1.

The FAC provides the following overview of the matter:

> This is a civil action to forfeit assets *traceable to* and *involved in* a multi-year conspiracy to manipulate the securities markets and to launder the proceeds of a massive market manipulation scheme that generated over $40 million in illicit proceeds. Over the course of a three-year period, between 2014 and December 2016,[4] Joseph Taub conspired with multiple other individuals to manipulate the securities market in order to reap huge trading gains, to make misrepresentations to banks in order to carry out the scheme, and to launder the proceeds of such criminal conduct.

*Id.* ¶ 2 (emphases added).

The FAC describes the Scheme in the following manner. CTEs were a "series of near-simultaneous transactions designed to artificially influence the market price of [a] security and to induce other market participants to trade in the security based on the false impression that there was real market interest in the security." *Id.* ¶ 27. In other words, CTEs artificially influenced a stock's price. *Id.* Most of the CTEs involved at least two accounts, which the FAC refers to as a

---

[4] The FAC and Superseding Indictment are somewhat incongruent as to the dates of the Scheme. The Superseding Indictment alleges a start date in 2013 while the FAC refers to 2014. In addition, while the Superseding Indictment alleges an end date of in or about 2016, the FAC specifies December 2016.

"Winner Account" and a "Loser Account." *Id.* ¶ 29. To work, the accounts had to be on the opposite sides (buying/offering to buy or selling/offering to sell) of a transaction. A Winner Account purchased a large block of shares in a security, while a Loser Account placed multiple small orders in the same security to create pressure on the stock's price, that is, to push the price of the stock higher. *Id.* Once the Loser Account moved the stock's price higher, the Winner Account sold its large position and reaped the benefits of the price increase. *Id.* The Loser Account, having done its job, cancelled all unexecuted orders it had placed after the Winner Account cashed out. *Id.* At the same time, the Loser Account would "almost always" incur small losses while artificially inflating (or deflating as the case may be) the stock's price. *Id.* ¶ 41.

The FAC also describes two different aspects of the Scheme. Initially, Taub worked in tandem with another co-conspirator or co-conspirators to execute the CTEs. *Id.* ¶ 28, 41. For convenience, the Court refers to this facet of the Scheme as the "First Phase."[5] However, brokerage firms responded by closing brokerage accounts used in the Scheme. *Id.* ¶ 30; *see also id.* ¶¶ 62-67. As a result, the Scheme evolved to using "Straw Accounts." *Id.* ¶ 31. Such accounts were primarily funded by Taub. *Id.* The FAC describes the Straw Accounts as follows:

> Taub and others instructed the Straw Account Holders to lie to the brokerage firms when opening and maintaining the Straw Accounts, including by misrepresenting: who controlled the accounts, who funded the accounts, and who executed the trades in the accounts. The Co-Conspirators also took steps to conceal who controlled the accounts, including by masking the locations from which they logged into the Straw Accounts.

*Id; see also id.* ¶ 41. Again, solely for convenience, the Court refers to this aspect of the Scheme as the "Straw Account Phase." The FAC also refers to other attempts to mask who controlled

---

[5] The FAC does not use the term "First Phase." Instead the Court uses First Phase to differentiate this facet of the Scheme from the later use of the Straw Accounts.

brokerage accounts, *see, e.g., id.* ¶¶ 50-53, 165-172, but it is not clear whether the Government contends that these accounts were also Straw Accounts.

Overall, the CTEs are alleged to have involved at least 73 accounts[6] in 12 different brokerage firms. *Id.* ¶ 33. The FAC provides five examples of CTEs. *Id.* ¶ 38. As noted, the FAC alleges that a successful CTE resulted in an average of profit of under $2,000, that the entire Scheme netted over $40 million in profits, and that there were "at least 30,000" CTEs. *Id.* ¶¶ 39, 40. The FAC adds that two brokerage accounts made over $14 million in profits between May 2014 and September 2015. *Id.* ¶ 76.

Given the large number of CTEs involved, and the relative meager amount of profits on a single successful CTE when compared with the overall illicit profit, the FCA resorts to the use of descriptive words pertaining to a large swath of illicit activity. *See, e.g., id.* ¶ 29 ("primarily," "generally"); ¶ 40 ("typically"); ¶ 104 ("[a] majority"); ¶ 105 ("most"); ¶ 207 ("a large portion"). The FCA goes on to allege that an "[a]nalysis reveals that approximately 91.2% of the trading activity in the accounts in which CTEs were alleged to have occurred consisted of CTEs." *Id.* ¶ 73. The FCA, however, does not indicate who conducted the analysis, what was considered in the analysis, the methodology used in the analysis, or how the percentage was calculated. The FAC also includes an Exhibit A, which shows the "amount of profits generated in the brokerage accounts used" in the Scheme. *Id.* ¶ 74, Ex. A. The exhibit, however, does not indicate what percentage of the profits in any of the listed accounts is attributable to the Scheme.

The FAC then provides different categories, with each category identifying an account or accounts through which illicit activity allegedly occurred. The categories are as follows: Taub's

---

[6] The FAC, however, also includes a header that indicates that "over one hundred" brokerage accounts were used to conduct CTEs. *Id.* at p. 61.

use of bank accounts in his name, his wife's name, and the names of corporate entities he controlled to launder proceeds of the Scheme, *id.* ¶¶ 82-110; Taub's brokerage accounts in 2016 that contained proceeds of and funds traceable to the Scheme's proceeds, *id.* ¶¶ 112-28; Taub's laundering of funds traceable to the Scheme in retirement accounts and accounts for his children, *id.* ¶¶ 129-64; co-conspirator Elazar Shmalo's accounts connected with the Scheme, *id.* ¶¶ 173-82; Chava Taub's (Taub's sister) accounts that were used in the Scheme and laundering of funds, *id.* ¶¶ 184-99; Taub's use of accounts held in the names of others to continue the Scheme and conceal Taub's trading in those accounts, *id.* ¶¶ 217-37, 279-346; and Taub's transfer of proceeds from the Scheme into Ultimate Venture LLC's accounts, further illegal trading in those accounts, and then subsequent transfers and trading in other accounts, *id.* ¶¶ 238-78. The FAC also alleges that Taub recruited co-conspirator Shaun Greenwald to make false representations to banks in furtherance of the Scheme, *id.* ¶¶ 200-16; and that Taub invested approximately $13 million, which were proceeds traceable to the Scheme, in limited liability companies, *id.* ¶¶ 347-503.

Many of the allegations as to the listed accounts are stated in conclusory fashion. *See, e.g., id.* ¶ 86 ("was traceable to"); ¶ 88 ("in proceeds or funds traceable to"); ¶ 93 ("received funds traceable to"); ¶ 109 ("funded with proceeds of illegal trading"); ¶ 122 ("either generated or funded and received the proceeds of the CTEs"); ¶ 119 ("constantly received proceeds from trading accounts in which CTEs were conducted"); ¶ 158 ("which was used to conduct illegal manipulative trading"). In other words, the allegations do not actually trace the proceeds nor do they analyze the specific manipulative trades and the resulting illicit profits.

## II.    Procedural History

The Government filed its Verified Complaint for Forfeiture *In Rem* on December 12, 2016. D.E. 1. Taub responded with a motion to dismiss, which the Court granted in part. D.E. 107. The

Court denied Taub's motion as to the Complaint's failure to plead a viable claim of securities fraud but granted it as to the Complaint's failure to sufficiently trace the seized property concerning the Scheme. *Id.* The Government then filed the FAC. The FAC brings two claims for forfeiture: (1) a violation of 18 U.S.C. § 981(a)(1)(A) based on 18 U.S.C. §§ 1956, 1957; and (2) a violation of 18 U.S.C. § 981(a)(1)(C) based on 15 U.S.C. §§ 78j(b), 78i(a)(2), 78ff, which includes both securities fraud and conspiracy to commit securities fraud. FAC ¶¶ 504-09. The current motion followed.

### III.    Legal Standard

The FAC is subject to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture. Specifically, Supplemental Rule G(2)(f) provides that a complaint for a forfeiture action *in rem* must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). The parties dispute the pleading standard demanded by this rule; the Third Circuit has not ruled on the issue. When applying Rule E(2), the predecessor to Rule G(2), courts were in agreement that the rule required more than the then existing notice standard, as announced in *Conley v. Gibson*, 355 U.S. 41 (1957), for complaints filed pursuant to Federal Rule of Civil Procedure 8. *See, e.g., United States v. One Partially Assembled Drag Racer*, 899 F. Supp. 1334, 1339 (D.N.J. 1995) ("Under Rule E(2)(a), judicial forfeiture proceedings must be pleaded with greater specificity than the mere notice pleading generally allowed in civil actions under Federal Rule of Civil Procedure 8(a).") (citations omitted).

*Conley*'s notice pleading standard, however, has been abrogated by the United States Supreme Court. Instead, the plausibility standard now applies to complaints filed pursuant to Rule 8. To meet the standard, a plaintiff must allege "enough facts to state a claim to relief that is

*plausible on its face.*" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015). If, after viewing the allegations in the complaint in a light most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

As a result, there appears to be three potential standards of review: (1) a standard greater than *Conley*'s notice requirement but less than the plausibility standard; (2) plausibility; or (3) a requirement greater than the plausibility standard. At the same time, it is clear that at this stage,

the Government is not required to prove its case by a preponderance of the evidence, the Government's burden of proof at trial pursuant to 18 U.S.C. § 983(c). *See United States v. Real Prop. Located at 5208 Los Franciscos Way, Los Angeles, Cal.*, 385 F.3d 1187, 1193 (9th Cir. 2004) ("It is true that [the Civil Asset Forfeiture Reform Act of 2000] imposes upon the government the ultimate burden of establishing forfeiture by a preponderance of the evidence, but the statute also provides expressly that the government may use evidence gathered after the filing of a forfeiture complaint to meet this burden.") In *$2,200,000 in U.S. Currency*, the court ruled that the pleading standard "under Supp. R. G(8)(b) *is higher than* the standard for Fed. R. Civ. P 8(a)[.]" No. 12-3501, 2014 WL 1248663 *6 (D. Md. Mar. 26, 2014) (emphasis added). Given the severe nature of pre-adjudication seizures, *see, e.g.*, *Drag Racer*, 899 F. Supp. at 1340, it would certainly seem appropriate for a complaint to meet a standard more demanding than plausibility.[7] However, because the Court's decision in this case would be same whether it applied the plausibility test or some more rigorous requirement, the Court finds that at a minimum, a civil *in rem* forfeiture complaint must at least meet the plausibility requirements set forth in *Iqbal* and *Twombly*.

Before turning to the substantive analysis, the Court addresses an argument made by Taub concerning the information that the Court may consider as to the current motion. Taub submits that he has performed his "own partial tracing analysis," which "conservatively" supports estimates that $18,787,131 in profits are not subject to civil forfeiture. Br. at 10-12. Taub arrives at this figure through the aid of a former FBI agent, Roy Pollitt, and other experts who now work

---

[7] For example, a prudent standard may require the relevant complaint to demonstrate a reasonable likelihood of success on the merits, as required when moving for a preliminary injunction, *see New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012), because the seizures at issue are certainly a form of equitable relief. Such a standard would not require the Government to show actual success on the merits, as it would be required to do at trial.

for a financial investigations and analytics firm. *Id.* at 10. Taub explains that the experts reached their calculation by analyzing (and de-duplicating where necessary) amounts from the following categories: (1) trades that took place in accounts with CTEs but which have not been identified by the Government as CTEs; (2) CTEs that took place in accounts openly controlled by Taub, *i.e.* accounts in which brokerage firms were aware that Taub was doing the trading; (3) CTEs involving only "long trading"; and (4) trades that took place before Taub received warning letters from any brokerage firms. *Id.* at 11.

The Court may not consider such expert analysis at the motion to dismiss stage. Pursuant to Supplemental Rule G(8)(b), Taub is permitted to make a motion to dismiss under Federal Rule of Civil Procedure 12(b). Supp. R. G(8)(b)(i). In deciding a Rule 12(b) motion for failure state a claim upon which relief can be granted, the Court relies on the well-pleaded facts from the FAC, which are taken as true for the purposes of the current motion. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012). The Court may also consider exhibits integral, or attached, to the FAC as well as matters of public record. *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). For example, the Court may take judicial notice of documents filed in other court proceedings because they are matters of public record. *Liberty Int'l Underwriters Can. v. Scottsdale Ins. Co.*, 955 F. Supp. 2d 317, 325 (D.N.J. 2013). To properly consider Taub's experts' analysis, the Court would have to convert the current motion to one for summary judgment under Federal Rule of Civil Procedure 56 as mandated by Rule 12(d).[8] Given that no expert discovery has occurred, the Court will not convert the motion to one for summary judgment.

---

[8] The Court would use the Federal Rules of Civil Procedure because the relevant Supplemental Rules do not address the issue of converting a motion to dismiss to one for summary judgment. *See* Supp. R. G(1) ("This rule governs a forfeiture action in rem arising from a federal statute. To the extent that this rule does not address an issue, Supplemental Rules C and E and the Federal Rules of Civil Procedure also apply.").

After the Court informed counsel during oral argument that it would not be considering the proffered expert analysis, Taub submitted a letter indicating that the Court could consider such information. D.E. 190. In the letter, Taub asserts that certain courts have considered affidavits in deciding a motion to dismiss, when such information does not prejudice the other side. *Id.* at 1 (citation omitted). Taub concedes that affidavits cannot enter into the equation when they contradict the complaint at issue. *Id.* at 2 (citations omitted). However, Taub's expert analysis does not rely on information in the FAC; to the contrary, the analysis considers a list of 23,000 alleged CTEs that were previously supplied by the Government. Br. at 11 n.4. Moreover, the analysis does directly contradict the allegations in the FAC because the FAC alleges that over $40,000,000 in illicit profits were made a result of the scheme while Taub's experts assert that over $18,000,000 is not subject to forfeiture. Similarly, the second category of exclusion – CTEs that took place in accounts openly controlled by Taub – do not fall outside the scope of the FAC. To the contrary, the FAC asserts that such *CTEs* (as opposed to other trades) are subject to forfeiture. The Court therefore does not consider Taub's experts in deciding the current motion. As a result, Taub's request to the vacate the restraining order as to the $18,787,131, Br. at 30-39, is also denied.

## IV.  Analysis

The difficulty posed in this case is the vast amount of trades that comprise the CTEs, the relatively low amount generated by each successful CTE, and the enormous overall profit alleged. Compounding the difficulty is that, at least as to the non-Straw Account portion of the Scheme, the Government appears to allege that some of Taub's trading profits are not forfeitable. In other words, weeding out illicit profits from legal proceeds is no easy task. This case is unlike, for example, an insider trading securities fraud. In insider trading, isolating the improper trades is

relatively easy. In fact, the underlying criminal activity and resulting proceeds from the offense is often not in dispute. *See, e.g., United States v. All Funds on Deposit in Dime Savings Bank*, 255 F. Supp. 2d 56, 58-59 (E.D.N.Y. 2003) (addressing civil forfeiture action commenced after conviction for health care fraud and agreement to forfeit $1.49 million).

Taub makes the following arguments in support of his motion: (1) the FAC does not plead the Scheme with requisite specificity; (2) the FAC does not sufficiently trace the seized assets to specific manipulative trades; and (3) the FAC's money laundering allegations are not adequate to save the FAC. Br. at 13-29. The Government responds that (1) the FAC sufficiently alleges the Scheme; (2) the FAC does not need to provide detailed tracing; and (3) the money laundering allegations are properly alleged. Opp. at 22-68.

As to Taub's first argument, the Court agrees with the Government that the Scheme itself is adequately pled in the FAC. In conducting an independent review of the FAC's allegations concerning the Scheme, the Court find the Scheme to be sufficiently alleged. Moreover, in light of United States Supreme Court precedent, Taub cannot challenge the adequacy of the pleadings as to the Scheme itself. In *Kaley v. United States*, 571 U.S. 320, 324-25 (2014), the petitioners (hereinafter "the defendants") were indicted for a scheme to steal medical devices and resell them at a profit. After the indictment, the government obtained a restraining order pursuant to 21 U.S.C. § 853(e), which prohibited the defendants "from transferring any assets traceable to or involved in the alleged offenses." *Id.* at 325. The seized assets included a $500,000 certificate of deposit that the defendants had intended to use for counsel fees. *Id.*

The Court in *Kaley* observed that it had previously decided in *United States v. Monsanto*, 491 U.S. 600 (1989), that a pre-trial asset restraint was constitutional when there was probable cause to believe that the restrained property is forfeitable. *Id.* at 323 (citing *Monsanto*, 491 U.S.

at 615.). The Court continued that such a decision had two considerations: first, whether there was probable cause that the defendant committed an offense allowing forfeiture, and second, whether there was probable cause that the property at issue had the "requisite connection" to the offense. *Id.* at 346 (citing 21 U.S.C. § 853(e)). The *Kaley* Court noted that following *Monsanto*, lower courts had consistently permitted defendants to litigate the second prong, that is, "whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment." *Id.* at 324.[9]

The Supreme Court indicated, however, that lower courts were divided over whether a defendant could challenge the first aspect as to probable cause for the charged crime. *Id.* The *Kaley* Court held that once a grand jury returns an indictment, a defendant cannot challenge probable cause as to the commission of the offense underlying the forfeiture. *Id.* at 340-41. The Supreme Court stated that historically, a grand jury's return of a proper indictment "conclusively" establishes probable cause to believe that the defendant committed the crime charged. *Id.* at 328 (citations omitted). The Court in *Kaley* further stated that an indictment triggers the issuance of an arrest warrant for a defendant not in custody, noting that it would be peculiar if an indictment could permit the seizure of a person but not of property. *Id.* at 329-32 (citations omitted).

As noted, the Superseding Indictment charges Taub with the same Scheme as set forth in the FAC. Pursuant to *Kaley*, Taub cannot challenge the probable cause finding as to the Scheme. Yet, the Court is aware that *Kaley* addressed criminal forfeiture, while the FAC is a civil forfeiture

---

[9] Critically, the majority in *Kaley* appeared to indicate that a defendant could still challenge the probable cause as to the traceability prong even if an indictment contains a forfeiture provision. Justice Kagan explained that "the tracing of assets is a technical matter far removed from the grand jury's core competence and traditional function – to determine whether there is probable cause to think the defendant committed a crime." *Id.* at 331 n.9. Justice Kagan added that a "judge's finding that assets are not traceable to the crime charged in no way casts doubt on the prosecution itself." *Id.*

action. No party, however, has presented any authority indicating that *Kaley* would not apply with equal force to civil forfeiture actions that parallel charges in an indictment. The Court was not able to locate any such authority through its own independent research. However, to the extent *Kaley* does not control, the Court independently finds that the Scheme is sufficiently pled in the FAC.

In addition to the Scheme, the FAC alleges money laundering violations contrary to 18 U.S.C. §§ 1956, 1957. Section 1956 provides in relevant part as follows:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> > (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
> > (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
> > (B) knowing that the transaction is designed in whole or in part--
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
> > (ii) to avoid a transaction reporting requirement under State or Federal law,
>
> shall be sentenced to . . . .

18 U.S.C. § 1956(a).

> Section 1957, in turn, provides in relevant part:

> (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).
> . . .

> (d) The circumstances referred to in subsection (a) are—

> (1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or
> (2) that the offense under this section takes place outside the United States and such special jurisdiction, but the defendant is a United States person (as defined in section 3077 of this title, but excluding the class described in paragraph (2)(D) of such section).

18 U.S.C. § 1957(a), (d).

In *United States v. Voigt*, 89 F.3d 1050, 1080-88 (3d Cir. 1996), the Third Circuit reviewed the degree of tracing required for laundered proceeds in a criminal forfeiture proceeding.[10] Voigt was the "mastermind of a scheme to defraud loan applicants and potential investors by inducing them to pay substantial 'advance fees' for nonexistent loans and investments." *Id.* at 1060. Following a lengthy jury trial, Voigt was convicted of conspiracy to commit wire fraud, wire fraud, money laundering, and tax evasion. *Id.* Based on the money laundering convictions, Voigt was liable for $1,661,960 in criminal forfeiture. *Id.* at 1081. The prosecution sought to forfeit jewelry and vehicles as "involved in" or "traceable to" to Voigt's money laundering pursuant to 18 U.S.C. § 982 or as substitute assets under 21 U.S.C. § 853. *Id.* The jewelry was purchased with funds from an account in which laundered funds and other monies had been commingled; in addition, "numerous deposits and withdrawals" had occurred "between the deposit of the laundered funds and the purchase of the jewelry." *Id.*

The Third Circuit addressed the issue in the following manner:

> We hold that the term "traceable to" means exactly what it says. In light of our holding on the burden of proof, this means that the government must prove by a preponderance of the evidence that the property it seeks under § 982(a)(1) in satisfaction of the amount of criminal forfeiture to which it is entitled has *some* nexus to the property "involved in" the money laundering offense. For example,

---

[10] The Government indicates that "[n]ot all courts agrees that *Voigt* was correctly decided[.]" Opp. Br. at 48 n.7 (citations omitted). Be that as it may, this Court is obligated to follow binding Third Circuit precedent.

15

if the defendant receives $500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense. If the defendant purchased a $250,000 item with that money, the government may seek the remaining cash as "involved in" the offense, whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense.

Where the property involved in a money laundering transaction is commingled in an account with untainted property, however, the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is "traceable to" money laundering activity will be difficult, if not impossible, to satisfy.

*Id.* at 1087 (emphasis in original) (footnote omitted). To the extent the prosecution could not meet the nexus requirement, the court in *Voigt* indicated that the remedy was the substitute asset provision. *Id.* at 1087-88.

In light of the standard, the Circuit concluded that the prosecution could not prove by a preponderance of the evidence that the jewelry was traceable to the money laundering activity. *Id.* at 1088. Yet, because the government was entitled to the full $1.6 million in forfetiure, the *Voigt* court continued, the government was permitted on remand to amend the judgment so that the jewelry was forfeitable as a substitute asset. *Id.*

The Third Circuit again addressed the money laundering tracing requirement in *United States v. Stewart*, 185 F.3d 112 (3d Cir. 1999). Stewart, a lawyer, engaged in a complex series of fraudulent transactions that involved insurance companies and shell corporations. *Id.* at 116. Stewart deposited $3 million from the scheme into a financial account that already had $160,000 in legitimate funds. *Id.* at 118. The government obtained a pretrial restraint on the account, but then agreed to release $600,000 for counsel fees; the parties stipulated that the $160,000 was part of the $600,000. *Id.* Following Stewart's criminal conviction, the government asked that all of

the funds in the account be forfeited pursuant to 18 U.S.C. § 982(a)(1), as property "involved in" or "traceable to" the money laundering offenses. *Id.* Although the government successfully traced the full $3 million to the money laundering, the trial court found that *Voigt* precluded direct forfeiture of the remaining amount (approximately $2.6 million) because it had been commingled with the $160,000. *Id.*

The Third Circuit disagreed and ruled that *Voigt* was distinguishable because (1) the government was not asking to forfeit property purchased with commingled funds, (2) the government sufficiently traced the $3 million that went into the account, and (3) Stewart's case "did not involve numerous withdrawals and deposits from and into an account containing commingled funds[.]" *Id.* at 129. The court in *Stewart* also noted that the substitute asset provision only applied "when the commingled property cannot be 'divided without difficulty.'" *Id.* at 130 (quoting 20 U.S.C. § 853(p)(5)). The Third Circuit concluded that because Stewart had stipulated that the $600,000 included the $160,000 in untainted funds, the "remaining approximately $2.6 million" was properly forfeitable as traceable to the money laundering activity. *Id.*

*Voight* and *Stewart* control the Court's analysis here. Because the substitute asset provision is not available in this civil forfeiture action,[11] the FAC's money laundering claim must sufficiently allege that the seized property was "*involved in* a transaction or attempted transaction in violation of section 1956, 1957 . . . of this title, or any property *traceable to* such property." 18 U.S.C. § 981(a)(1)(A) (emphasis added).

The real issue, in the Court's view, is the degree of connection that the FAC must allege between the underlying offenses and the property seized – whether the connection be characterized

---

[11] The substitute asset provision applies to criminal, not civil, forfeiture actions. 21 U.S.C. §§ 853(p); 2461(c).

as tracing, related, a nexus, or some similar term. The Government contends that while it has sufficiently traced the seized property to the Scheme and the money laundering allegations, it is not required to do so at the pleading stage. Opp. at 35 ("[T]he government need not trace the defendants *in rem* to the underlying offenses at the motion to dismiss stage[.]") (citing *United States v. Aguilar*, 782 F.3d 1101, 1109 (9th Cir. 2015). The Government is correct that the Ninth Circuit in *Aguilar* indicated that "tracing is not at issue at the motion to dismiss stage" and that "the government need not show that all of the claimed property is tainted to satisfy Supplemental Rule G(2)(f)." *Aguilar*, 782 F.3d at 1109. The Court, however, disagrees in light of the plain language of the statutes at issue, the extraordinary nature of pre-adjudication seizures, and persuasive authority found in other decisions.

As noted, the Government seeks forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C). Those sections provide as follows:

(a)(1) The following property is subject to forfeiture to the United States:

> (A) Any property, real or personal, *involved in* a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property *traceable to* such property.
> . . .
> (C) Any property, real or personal, which *constitutes or is derived from proceeds traceable to* a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) (emphases added). Thus, the plain language of subsection (a)(1)(A) requires the seized property to have been "involved in" the stated violations or be "traceable to" such property. Likewise, the plain language of subsection (a)(1)(C) requires the seized property to constitute or be derived from "proceeds traceable" to the stated violations. *See*

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009) ("We begin, as we must, by examining the plain language of the statute."); *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) ("Where the statutory language is plain and unambiguous, further inquiry is not required.") (citation omitted). As a result, the plain language of the relevant provisions indicates that the stated nexus – involved in, traceable to, and proceeds – is an element of the civil forfeiture claims. Accordingly, and at a minimum, the Government must plausibly plead the requisite connection between the underlying offense and the seized property.

In addition, pre-adjudication seizure is an extraordinary remedy. The court in *Drag Racer*, when discussing the predecessor to Supplemental Rule G, put it in the following terms:

> Civil forfeiture is a powerful tool in the government's battle against crime, and its use is circumscribed by important Fourth and Fifth Amendment rights. It must be carried out scrupulously within constitutional bounds. Accordingly, "[t]he requirements of Rule E(2)(a) are more than a mere technicality; they are a means of upholding this drastic remedy against a possible due process challenge and of preventing the seizure of the defendant property for long periods of time when, in fact, the government had no claim to the property."

*Drag Racer*, 899 F. Supp. at 1340 (quoting *United States v. 5100 Whitaker Ave.*, 727 F. Supp. 920, 924 (E.D. Pa. 1989)).

Finally, the Court finds numerous other decisions instructive. For example, in *United States v. Mondragon*, 313 F.3d 862 (4th Cir. 2002), the Fourth Circuit considered the pleading standard applicable to Supplemental Rule E(2)(a), the predecessor to Supplemental Rule G. In that case, the defendant was stopped while driving, and the police found a hidden compartment in the vehicle containing almost $500,000 in cash. *Id.* at 863-64. A drug detection canine also alerted to narcotics in the back seat of the car. *Id.* at 864. The government then filed a verified complaint, seeking forfeiture of the money as proceeds of drug trafficking. *Id.* The defendant filed a motion

to strike the complaint, arguing that it failed to "state the grounds with particularity required by [Supplemental] Rule E(2)(a)." *Id.* The district judge denied the motion. *Id.*

On appeal, the Fourth Circuit upheld the district court's decision. Critically, the *Mondragon* court found that the following facts, standing alone, did not "show a *sufficient connection between the currency and the drug trafficking* to satisfy the pleading requirement of [Supplemental] Rule E(2)(a): what currency was seized, how the currency was packaged, when it was seized, where it was seized, or by whom it was seized. *Id.* at 866 (emphasis added). Yet, the Fourth Circuit concluded that the complaint satisfied the particularity requirement because it also alleged a large amount of money in unusual packaging, the hidden compartment where the cash was found, and the drug dog positive alert. *Id.* The court in *Mondragon* further observed that the verified complaint also included information as to the arresting officer's experience with such hidden compartments' routine use by drug dealers and that the hidden compartment had been professionally constructed. *Id.*

Significantly, the Government acknowledges that *Mondragon* is the "leading case on Supplemental Rule E(2)(a)[.]" Opp. at 18. The Government also points to the *Gang Luan v. United States*, 722 F.3d 388, 398, 398 n.14 (D.C. Cir. 2013) as construing the advisory committee's note to Supplemental Rule G(2) to clarify that Supplemental Rule G(2)(f) codified the *Mondragon* court's interpretation of Supplemental Rule E(2)(a). *Id.* at 18-19.

In *$2,200,000 in U.S. Currency*, 2014 WL 1248663 *1, the government seized the claimant's property consisting of $2,200,000 in a bank account along with 102 checks and 34 money orders. Following the government's first amended verified complaint, the claimant filed a motion to dismiss for failure to state a claim. *Id.* at *1, *7. The cased involved three alleged analogues of a controlled dangerous substance. *Id.* The claimant manufactured the analogues in

California and then sold them to "smoke shops" in the United States. *Id.* at *2. The shops paid the claimant through checks and money orders. *Id.*

Among other things, the claimant argued that the amended complaint failed "to establish with sufficient particularity the nexus between Claimant's alleged unlawful conduct and the assets sought to be forfeited." *Id.* at *11 (internal quotation and citation omitted). The court in *$2,200,000* first determined that the amended complaint pled an adequate connection between the alleged crimes and the seized assets. *Id.* at *12-13. The district court, however, found that the government's allegations as to the bank account did not "establish a connection between funds received by [a relevant individual] or [the claimant] and those seized" from the account. *Id.* at *14. Instead, the court noted, the allegations were entirely conclusory. *Id.* As a result, the district judge granted the motion as to the $2,200,000 but also permitted the government to amend its operative pleading. *Id.* at *15.

The Court agrees with both *Mondragon* and *$2,200,000*. In a civil *in rem* forfeiture complaint, the Government must at a minimum allege a plausible connection between the underlying offenses and the relevant property.

In light of the foregoing standards, the Court determines that the FAC does not sufficiently allege a nexus between the underlying offenses and the seized property vis-à-vis the First Phase, *i.e.* the non-Straw Accounts aspects of the Scheme. The Court reaches the same conclusion as to the Straw Account Phase of the Scheme, while acknowledging that the FAC allegations are stronger as to the Straw Accounts.[12]

---

[12] There may also be a potential third category of allegations. Specifically, the FAC refers to other attempts to mask who controlled brokerage accounts, *see, e.g., id.* ¶¶ 50-53, 165-172, but it is not clear whether the Government contends that these accounts were also Straw Accounts. Because the Court is granting the Government leave to amend, the Government may clarify its position as to these accounts in a second amended complaint.

Overall, the FAC attempts to allege a sufficient nexus between the Scheme and the resulting illicit proceeds through various means. For example, the FAC indicates that "an analysis" demonstrates that "approximately 91.2% of the trading activity in the accounts in which CTEs were alleged to have occurred consisted of CTEs." FAC ¶ 73. The Court does not find this analysis allegation to be plausible because the FAC fails to indicate what information was considered in the analysis, what methodology was used, who performed the analysis, or how the percentage was calculated. Similarly, while the FAC provides five examples of CTEs, *id.* ¶ 38, the Court is unable to reasonably infer from such a small sampling that the Government has plausibly connected the Scheme to "at least" 30,000 CTEs, *id.* ¶ 39, as the FAC alleges. The FAC further attaches Exhibit A, which shows the "amount of profits generated in the brokerage accounts used" in the Scheme. *Id.* ¶ 74, Ex. A. The exhibit, however, does not indicate what percentage of the profits in any of the listed accounts is attributable to the Scheme. The FAC also relies on conclusory allegations, and, even then, the FAC does not refer to all of the proceeds from the Scheme. *See, e.g., id.* ¶ 29 ("primarily," "generally"); ¶ 40 ("typically"); ¶ 104 ("[a] majority"); ¶ 105 ("most"). Such conclusory allegations are not entitled to the presumption of truth and do not support a plausibility finding for *all* of the seized property.

The foregoing allegations apply to the First Phase. As a result, the First Phase of the Scheme is not plausibly pled. The Government asserts that the money laundering allegations provide an alternate basis for finding that the FAC has alleged a sufficient connection to the seized property. The Court finds this argument unavailing because (1) to the extent the laundered funds stem from proceeds of the First Phase, the nexus between First Phase and the property is not plausibly pled, and (2) the money laundering allegations are often conclusory, *see, e.g., id.* ¶ 86 ("was traceable to"); ¶ 88 ("in proceeds or funds traceable to"); ¶ 93 ("received funds traceable

to"); ¶ 109 ("funded with proceeds of illegal trading"). Following both *Voigt* and *Stewart*, the Government must plausibly allege that the seized property was "*involved in* a transaction or attempted transaction in violation of section 1956, 1957 . . . or any property *traceable to* such property." 18 U.S.C. § 981(a)(1)(A) (emphasis added). Thus, the Court finds that as to the First Phase, the FAC fails to plausibly allege a sufficient connection between the underlying criminal activity and the seized property.

The Court reaches the same conclusion as to the Straw Account Phase, but it is a closer call. The FAC sufficiently alleges that all funds used in the Straw Account Phase were intended to further the Scheme and were part of a conspiracy to commit the Scheme. The FAC also adequately indicates that the funds in the Straw Account Phase served no legitimate purpose. *See* FAC ¶ 170. As noted, the FAC describes the Straw Accounts in the following manner:

> Taub and others instructed the Straw Account Holders to lie to the brokerage firms when opening and maintaining the Straw Accounts, including by misrepresenting: who controlled the accounts, who funded the accounts, and who executed the trades in the accounts. The Co-Conspirators also took steps to conceal who controlled the accounts, including by masking the locations from which they logged into the Straw Accounts.

*Id.* ¶ 31.

Yet, like First Phase, the Straw Account Phase allegations fall short from plausibly alleging that *all* seized property related to the Straw Account Phase were proceeds of the Scheme. The statute defines proceeds, as relevant here, in the following manner:

> In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

18 U.S.C. § 981(a)(2)(A).[13] *See also United States v. George*, 886 F.3d 31, 39-41 (1st Cir. 2018) (discussing the definition of proceeds under Section 981(a)(2)(A) and referring to the "ill-gotten *gains*" of a conspiracy) (emphasis added).

Thus, the Straw Account Phase ultimately suffers from the same infirmities as the First Phase. The FAC does not plausibly allege a sufficient nexus between the Straw Account Phase and all of the seized property as proceeds from Scheme – or that all such proceeds were involved in money laundering or traceable to the money laundering.

For the foregoing reasons, the Court grants Taub's motion to dismiss the FAC for failure to adequately state a claim.

## V. Conclusion

Taub's motion is granted in part and denied in part. Taub's motion to dismiss the FAC is granted without prejudice. The Government shall have thirty days to file a second amended complaint which cures the deficiencies noted in this Opinion. If the Government fails to file within that time, the dismissal will be with prejudice. Taub's motion to vacate the restraining order and release at least a portion of the seized funds is denied. An appropriate Order accompanies this Opinion.

Dated: January 16, 2020

John Michael Vazquez, U.S.D.J.

---

[13] The definition of proceeds is not so broad as to encompass, for example, "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation[.]" 21 U.S.C. § 853(a)(2) (addressing criminal forfeiture for a conviction under Title 21). If this were the standard, then the Straw Account Phase would be plausibly pled because the FAC adequately alleges that the all of the deposits in the accounts were intended to facilitate the Scheme.